SEAN K. KENNEDY (No. 145632)
Federal Public Defender
E-mail: Sean_Kennedy@fd.org
CRAIG A. HARBAUGH (No. 194309)
Deputy Federal Public Defender
E-mail: Craig_Harbaugh@fd.org
321 East 2nd Street
Los Angeles, California 90012-4202
Telephone (213) 894-7865
Facsimile (213) 894-0081

Attorneys for Defendant
ADAM GARDENHIRE

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>ADAM GARDENHIRE,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | NO. CR 12-345-SVW<br><br>NOTICE OF MOTION; MOTION TO SUPPRESS STATEMENTS AND EVIDENCE; MEMORANDUM OF POINTS AND AUTHORITIES; DECLARATIONS<br><br>Hearing Date: September 4, 2012<br>Hearing Time: 11:00 a.m. |

TO:   UNITED STATES ATTORNEY ANDRÉ BIROTTE, JR., AND

ASSISTANT UNITED STATES ATTORNEY MELISSA MILLS:

Please take notice that on  March 5, 2012, at 9:00 a.m., or as soon thereafter  as

counsel may be heard, in the courtroom of the Honorable  Stephen V. Wilson, United

States District Judge, Defendant, Adam Gardenhire, will bring on for hearing the

following motion:

///

///

///

1

**<u>MOTION</u>**

2          Defendant Adam Gardenhire, by and through his attorney of record, Deputy

3   Federal Public Defender Craig A. Harbaugh, hereby moves this Honorable court to

4   suppressing all evidence, and fruits thereof, obtained as a result of the unlawful

5   interrogation of Gardenhire on March 29, 2012, and the unreasonable search of

6   Garden's home at 6416 Bakman Ave. North Hollywood, CA  91606.

7          This motion is based upon the attached Memorandum of Points and Authorities,

8   exhibits, declaration, all files and records in this case, and any further evidence as

9   may be adduced at the hearing on this motion.

10                                         Respectfully submitted,

11                                         SEAN K. KENNEDY
                                           Federal Public Defender
12

13
    DATED:  August 6, 2012          By   /s/  *Craig A. Harbaugh*
14                                       CRAIG A. HARBAUGH
                                         Deputy Federal Public Defender
15

16

17

18

19

20

21

22

23

24

25

26

27

28                                         2

## MEMORANDUM OF POINTS AND AUTHORITIES

## INTRODUCTION

On March 29, 2012, law enforcement officers swarmed Adam Gardenhire's home. Several officers from both the Burbank Airport Police and the North Hollywood police invaded Gardenhire's property while a Pasadena Police helicopter hovered above. Officers had no warrant to search the residence but ordered Gardenhire out of his house and forbid him from going back inside. Without reading him his rights, officers took turns interrogating Gardenhire until he relented. Although Gardenhire admitted to having a laser, he never gave permission to search his house. While keeping Gardenhire outside, officers pressured Gardenhire's aunt inside (just a few feet away) to consent.

Tbe police flagrantly violated Gardenhire's rights. Because Gardenhire was in custody at the time of his interrogation, officers were obliged to issue the *Miranda* advisement. In addition, officers conducted a warrantless search of his home without a valid exception. Rachelle Gardenhire's purported consent was involuntary. Moreover, the officers could not circumvent Gardenhire's anticipated objection by excluding him from the scene. Consequently, based upon these constitutional errors, the Court must suppress all of Gardenhire's statements and all physical evidence seized from his home.

## STATEMENT OF FACTS[1]

On March 29, 2012, an aircraft pilot reported a laser incident. A Pasadena Police Helicopter, which was also targeted with a laser, pinpointed the source to the vicinity of Gardenhire's residence and began circling while shining a light below. Approximately six officers went to the address. They first confronted his aunt. Officers eventually ordered Gardenhire to leave his residence. While touching their holstered firearms, officers refused Gardenhire's request to reenter his home.

[1]All facts are derived from attached Exhibits A and B, as well as Government produced discovery.

Gardenhire was ordered to sit in a lawn chair outside while he was peppered with a barrage of questions by two separate interrogators.  Eventually, Gardenhire admitted that he possessed a laser.  Gardenhire was never asked and never granted permission to search for the laser.  While Gardenhire was being interrogated outside, another officer asked Rachelle Gardenhire for consent to search.  She reluctantly consented only because she believed she had no choice.  Even though Gardenhire informed the officers that the laser was located in the closet in the grandfather's bedroom, the interrogating officer sent a radio transmission to the officer inside - less than 20 feet away - to ask permission to search from his aunt.  Officers recovered a laser inside a shoebox in the grandfather's closet.

The following day, officers interrogated Gardenhire again after advising him of his *Miranda* rights.

**III.**

**ARGUMENT**

**I.  Gardenhire's Un-Mirandized Statements Given in Response to Interrogation by Law Enforcement Officers While in Custody Must Be Suppressed**

In *Miranda v. Arizona*, 384 U.S. 436 (1966), the United States Supreme Court ruled that prior to custodial interrogation, an individual must be informed that he has certain constitutional rights.  In particular, an officer conducting an interrogation of a person in custody must advise the person that (1) he has the right to remain silent and anything he does say will be used against him in court; (2) he has the right to consult with a lawyer and have a lawyer with him during the interrogation; and (3) if he cannot afford a lawyer, one will be appointed to represent him.  *Id.* at 467-73.  A *Miranda* violation occurs when a suspect is interrogated while in custody without first being advised of these rights.  *See United States v. Gonzalez-Sandoval*, 894 F.2d 1043, 1046 (9th Cir. 1990).  Statements obtained in violation of *Miranda* may not be admitted against the accused in the prosecution's case-in-chief.  *United States v. Patterson*, 812 F.2d 1188, 1193 (9th Cir. 1987).

4

1    The Supreme Court's rule articulated in *Miranda* applies to all "custodial
2    interrogation."  As the Court explained, "[b]y custodial interrogation, we mean
3    questioning initiated by law enforcement officers after a person has been taken into
4    custody or otherwise deprived of his freedom of action in any significant way."
5    *Miranda*, 384 U.S. at 444.  The Supreme Court has further clarified that "custody"
6    for purposes of Miranda includes any situation where a reasonable person would not
7    feel free to leave.  *Stansbury v. California*, 511 U.S. 318, 323 (1994) (stating that
8    "the only relevant inquiry is how a reasonable man in the suspect's position would
9    have understood his situation") (internal quotation marks omitted).

10    "[I]n-custody determinations must be based on the totality of the
11    circumstances and are reviewed according to whether a reasonable person in such
12    circumstances would conclude after brief questioning that he or she would not be free
13    to leave."  *United States v. Hayden*, 260 F.3d 1062, 1066 (9th Cir. 2001) (alteration
14    and internal quotation marks omitted).  Where officers conduct an in-home
15    interrogation, courts should consider the following factors:  (1) the number of law
16    enforcement personnel and whether they were armed; (2) whether the suspect was at
17    any point restrained, either by physical force or by threats; (3) whether the suspect
18    was isolated from others; and (4) whether the suspect was informed that he was free
19    to leave or terminate the interview, and the context in which any such statements
20    were made.  *United States v. Craighead*, 539 F.3d 1073, 1084 (9th Cir. 2008).

21    In this case, the totality of the circumstances demonstrate that Gardenhire was
22    in custody at the time he was interrogated.  First, there were at least six armed
23    officers from two law enforcement agencies.  The coercive environment was
24    enhanced by the presence of the police helicopter circling above, shining the light at
25    Gardenhire's home.  "[T]he presence of a large number of visibly armed law
26    enforcement officers goes a long way towards making the suspect's home a
27    police-dominated atmosphere."  *Id.* at 1085.

28

Second, Gardenhire was restrained throughout his interrogation.  Initially, Gardenhire was restricted through physical intimidation, when he was ordered to leave his home.  The officers, who were touching their sidearms at the time, sent the not-so-subtle message that any resistance could be met with deadly force.  Officers then directed Gardenhire to sit in a lawn chair outside.  At some point during the interrogation, officers handcuffed Gardenhire, clearly restraining his movement. "When law enforcement agents restrain the ability of the suspect to move--particularly through physical restraints, but also through threats or intimidation--a suspect may reasonably feel he is subject to police domination within his own home and thus not free to leave or terminate the interrogation." *Craighead*, 539 F.3d at 1085.

With regard to the third factor, Gardenhire was not completely isolated but this factor is at best neutral.  The only person that Gardenhire was permitted to communicate with was his aunt.  But Rachelle Gardenhire was hardly a calming influence.  She was extremely hostile toward Gardenhire, yelling at him and blaming him for the invasion of police officers.

Fourth, the officers never informed Gardenhire of his right of refusal.  From the inception, the officers suspected Gardenhire of pointing the laser at aircraft. Officers rejected Gardenhire's denials and insisted that he needed to "be a man" and confess.  Officers not only failed to tell Gardenhire he was free to leave, they affirmatively represented that he was not.  Almost immediately after officers ordered Gardenhire outside, Gardenhire asked to go back into his home.  The officers refused.

Finally, though not a factor limited to in-home interrogations, Gardenhire's age further militates in favor of custody.  *See J. D. B. v. North Carolina*, 131 S. Ct. 2394, 2402-2403 (2011) (holding that a juvenile's age is relevant to the in-custody determination).  Gardenhire had barely attained majority age at the time of the interrogation and would have been less likely to have believed he could refuse to submit to interrogation than the typical adult.

6

In sum, the totality of circumstances demonstrate that Gardenhire was in custody at the time of his interrogation.  As such, the officers were required to issue the *Miranda* advisement prior to questioning.  The failure to do so warrants exclusion of his statements.  *United States v. Patane*, 542 U.S. 630, 641-642 (2004).

## II.  The Officers' Warrantless Search of Gardenhire's Home Was Unreasonable

"[S]earches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment --subject only to a few specifically established and well-delineated exceptions."  *Arizona v. Gant*, 129 S. Ct. 1710, 1716 (2009) (quoting *Katz v. United States*, 389 U.S. 347, 357, 88 S. Ct. 507, 19 L. Ed. 2d 576 (1967) (footnote omitted).  Consent constitutes an exception to the warrant requirement.  The prosecution bears the burden of proving consent was voluntary.  *Bumper v. North Carolina*, 391 U.S. 543, 548 (1968).  In making this determination, courts consider the following factors: "(1) whether defendant was in custody; (2) whether the arresting officers had their guns drawn; (3) whether *Miranda* warnings were given; (4) whether the defendant was notified that [he] had a right not to consent; and (5) whether the defendant had been told a search warrant could be obtained."  *United States v. Washington*, 490 F.3d 765, 775 (9th Cir. 2007) (quoting *United States v. Soriano*, 361 F.3d 494, 502 (9th Cir. 2004)).

### A.  Rachelle Gardenhire Did Not Consent Voluntarily

Here, the totality of circumstances demonstrate that Rachelle Gardenhire's consent was involuntary.  As discussed, the officers' presence was extensive, with at least six officers at the home.  Although the officers' guns were not drawn, their guns were clearly visible.  The officers did not place Rachelle Gardenhire under arrest but officers had already made clear that compliance with the officers' demands were required.  When Rachelle Gardenhire questioned whether the individuals outside her gate were in fact police officers, she was ordered to stop and put her hands up.  At least some of the officers entered the house without first obtaining permission.  Most

significantly, Rachelle Gardenhire was never informed that she had the right to refuse consent.  Exhibit B.  In sum, a person in her position would have reasonably believed that they had no choice but to acquiesce to authority.  Consequently, her consent was invalid and cannot justify the search.

### B.  Even if Consent Were Valid, the Officers Could Not Rely on the Aunt's Consent When They Precluded Gardenhire From Entering the House to Overcome His Anticipated Objection

In *Georgia v. Randolph*, the Supreme Court held that an occupant's consent to the warrantless search of a residence is not valid as to a physically present co-occupant who expressly refuses consent. 547 U.S. 103, 120, 126 S. Ct. 1515, 164 L. Ed. 2d 208 (2006).  Consent is equally invalid when "the police have removed the potentially objecting tenant from the entrance for the sake of avoiding a possible objection." *Randolph*, 547 U.S. at 121-22.

Here, the evidence demonstrates that the officers deliberately precluded Gardenhire from entering his home in order to avoid his anticipated objection.  Prior to the interrogation, officers denied Gardenhire access to his home.  When Gardenhire repeatedly denied any involvement, officers were asking Gardenhire's aunt for consent to search his room.  It is doubtful that officers believed that Rachelle Gardenhire had actual or even apparent authority to search his room.  Nevertheless, officers assumed Gardenhire would refuse consent so they never gave him the opportunity to do so.  When Gardenhire eventually caved to the officers' demands and revealed where the laser was located, the officers immediately sought consent not from Gardenhire but from his aunt.  It defies commonsense that the officers did not take the logical next step of asking Gardenhire to consent unless they were attempting to avoid an unfavorable response.  The officer's suspicious behavior is underscored by the fact that Gardenhire was being interrogated less than twenty feet from the entrance of his home.  Instead of walking the few steps it would have required to relay the information to the officers, Gardenhire's interrogator sent a

radio transmission to the officer inside.  Such gamesmanship exposes the officers' true scheme:  overcome Gardenhire's objection through exclusion.

**III.  The Court Must Suppress All of Gardenhire's Statements and All Physical Evidence Seized During the Unlawful Search**

Because Gardenhire's initial interrogation occurred without a *Miranda* advisement, all of his initial statement must be suppressed.  In addition, the physical evidence as well as his subsequent statements must be suppressed as fruits of the illegal search.

The Fourth Amendment requires not only the exclusion of all evidence directly obtained through an unlawful search but also the exclusion of all "fruits" flowing from the illegality. *Wong Sun v. United States*, 371 US. 471, 488 (1963). The test is whether the indirectly obtained evidence "has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." *Id*. at 488 (quoting Maguire, Evidence of Guilt, 221 (1959)).  Once a defendant has established a factual nexus between the unlawful search and the challenged evidence, the burden is on the government to show that the taint has been sufficiently diluted.  *United States v. Kandik*, 633 F.2d 1334, 1335 (9th Cir. 1980).

Here, there is a clear nexus between the unlawful search and Gardenhire's subsequent statement.  Gardenhire's confession was a direct result of the discovery of the laser device.  The issuance of *Miranda* warnings does nothing to dissipate the taint.  Consequently, all of Gardenhire's statements must be suppressed.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## CONCLUSION

For the foregoing reasons, Gardenhire respectfully requests that the Court suppress all statements and physical evidence obtained by law enforcement.

Respectfully submitted,

SEAN K. KENNEDY
Federal Public Defender

DATED: August 6, 2012          By   /s/ Craig A. Harbaugh
                                   CRAIG A. HARBAUGH
                                   Deputy Federal Public Defenders

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28