## DECLARATION OF THOMAS DAVENPORT

I, THOMAS DAVENPORT, declare as follows:

1. I am a Sergeant with the Burbank Airport Police Department and have served as a law enforcement officer for this agency for approximately 31 years. Prior to that employment, I served for five years as a United States Marine. I submit this declaration in support of the United States' Opposition to Motion to Suppress Evidence in the matter of United States v. Adam Gardenhire, CR 12-345-SVW.

2. On March 29, 2012, I received a report that a laser that had been used to strike aircraft that evening was traced to a residence on Bakman Avenue in North Hollywood. I responded to that address at approximately the same time as two other law enforcement officers.

3. When I arrived, I stood outside the gate and observed a woman, later identified as defendant's aunt, running away from the gate toward the house. I was in full police uniform. I verbally identified myself as a police officer and told her that I wanted to speak with her. I did not order her to put her hands in the air, although I believe that I advised her to keep her hands where I could see them. This is my frequent practice, for safety purposes.

4. Defendant's aunt unlocked the gate and let me into the yard. I asked if it was her house, and she told me that it was. I asked her whether she had knowledge of anyone using a laser pointer on the property, and she said that she did not. I asked who else was there, and she replied that her 18-year old nephew and grandparents were there. I told her that I would like to

talk to her nephew, and she agreed to relay that message. Defendant's aunt went into the house, and shortly thereafter, her nephew - subsequently identified as the defendant, Adam Gardenhire - appeared and walked over to me.

5. I asked defendant if he knew anything about anyone pointing a laser at any airplanes or helicopters, and he replied that he did not. I asked defendant if he owned a laser pointer and he replied that he did not. I asked defendant if he knew of anyone else at his house or any neighbors that might have pointed a laser at an aircraft, and defendant speculated that perhaps the neighbors were responsible, because they were "gang bangers." In total, my conversation with defendant lasted approximately two to three minutes. Throughout this time, defendant and I were both standing and talking face to face. I never ordered him to sit down, and he did not do so. At no time did defendant request that he be allowed to go inside the house, to leave, or to stop talking with me. Defendant was never handcuffed during our conversation.

6. After I spoke with defendant, I walked approximately ten feet over to where defendant's aunt was standing. I asked her if she knew whether her nephew had a laser pointer, and she stated that she did not. I asked her if I could go into the house and take a look around. She agreed, and she led me to the front door and inside the house. When I made my request to go inside the house and look around, defendant was approximately ten feet away from me. Defendant was in a position to observe his aunt escorting me inside. Defendant did not raise any objection to his aunt taking me inside the house to look around.

7.  When I asked for permission to enter the house and look around, I did not ask to talk to defendant's aunt's father, nor did I ever speak with defendant's aunt's father.  As I entered the house, I saw an elderly gentleman sitting inside, but he and I did not exchange any words.

8.  As I was walking inside with defendant's aunt, Officer Woolner approached defendant and began to speak with him.

9.  Defendant's aunt walked me into a small bedroom that she said was defendant's.  She told me I could search the room if I wanted to.  At that point, I received a radio transmission advising that defendant had admitted to Officer Woolner that he had a laser and that he had been pointing it at aircraft that evening.  The transmission further advised that defendant had told Officer Woolner that he hid the laser in a shoe box in his grandfather's bedroom.  I asked defendant's aunt, who was still standing next to me, if I could go into the grandfather's bedroom to retrieve the laser.  Defendant's aunt said that I could.

10. Defendant's aunt then led me into a different bedroom.  Around that time, Officer Woolner joined us.  I observed a shoe box on a high shelf of the closet, and either Officer Woolner or I pulled the shoe box down from the shelf.  I saw a laser pointer on top of a pair of shoes in the box.  Officer Woolner removed the laser from the box.

11. The time elapsed between my arrival at the house and the recovery of the laser was approximately 15 minutes in total.

12. When I arrived at the house, the police helicopter that had pinpointed the house as the laser's origin was circling overhead.  Soon after the ground officers arrived, the helicopter

left the area.

13. I did not place my hand on my service weapon while at the house, nor did I see any other officers doing so.

14. Apart from myself and Officer Woolner, I am not aware of any other law enforcement officers entering the defendant's house while we were there that evening. I was the first officer to enter the house, and I did not do so before receiving permission from defendant's aunt.

15. I am familiar with the dangers associated with shining a laser at an aircraft in flight.

16. I have seen laser pointers on numerous occasions. To my knowledge, they tend to be small - some as small as perhaps two inches in length - and housed in a casing that can be flimsy. Based on these experiences, it is my understanding that a laser pointer could be easily destroyed or smuggled away from a crime scene.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge.

Executed August 17, 2012, in Los Angeles, California.

*Thomas Davenport* (signature)
THOMAS DAVENPORT