<u>DECLARATION OF MICHAEL WOOLNER</u>

I, MICHAEL WOOLNER, declare as follows:

1.    I am a police officer and helicopter pilot with the Glendale Police Department.  I have served with this agency as a police officer for seven years, including four years as a helicopter pilot and three years as a patrol officer.  I submit this declaration in support of the United States' Opposition to Motion to Suppress Evidence in the matter of <u>United States v. Adam Gardenhire</u>, CR 12-345-SVW.

2.    On March 29, 2012, I was on duty monitoring radio traffic at the heliport for the Joint Burbank/Glendale Air Support Unit, located at Burbank Airport.  I learned from a radio transmission that a police helicopter had been struck by a green laser originating from a specified location in North Hollywood.

3.    My partner and I responded to the location to assist in locating the suspect.  When we arrived, other police units were also responding to the scene.  The police helicopter that had reported the laser strike was making wide circles overhead.  It left the area shortly after we arrived on the ground.  During my time at the scene, there was also a news helicopter circling overhead nearby; it was reporting on an unrelated fire in the neighborhood.

4.    Upon arrival, I went to the side of the house.  Through an uncovered window into a fully lit living room, I could see a young man - later identified as defendant Adam Gardenhire - walking through the room without a shirt.

5.    At that time, I heard officers on the other side of the house yelling at a woman outside the house to come toward them.

1

I then observed defendant walking and then running back and forth across the living room, disappearing briefly from sight a couple of times. Defendant was moving very quickly and appeared to be in a frantic state.

6.   Shortly thereafter, I walked around the house and saw defendant standing in front of the house. I observed him talking with Sergeant Davenport from the Burbank Airport Police Department. I heard defendant denying any participation in the laser strike and suggesting that maybe his neighbors were responsible.

7.   What I saw of defendant's conversation with Sergeant Davenport lasted approximately one or two minutes. Both defendant and Sergeant Davenport were standing while they talked, and their tone and volume were conversational. Defendant did not ask to leave or to go inside. Defendant was not ordered to sit down, nor did he sit down, during this brief conversation.

8.   I then saw Sergeant Davenport walk away from defendant and over to defendant's aunt, who was standing about seven or eight feet away. Sergeant Davenport spoke briefly with defendant's aunt, and then proceeded into the front door of the house. I believe he was accompanied by defendant's aunt. No officers entered the house before Sergeant Davenport did so after speaking with defendant's aunt.

9.   Defendant was standing about five feet away from the front door and was oriented in a position that he could clearly see Sergeant Davenport entering the house. Defendant did not make any objection to Sergeant Davenport entering the house.

10.   I then approached defendant and engaged him in a brief

2

conversation. I explained that the police helicopter overhead had tracked the laser beam back to his house, and that we believed that he was responsible for shining the laser. I told him, in substance, "Just be honest about it. Be a man and tell us the truth." Defendant took a deep breath, exhaled, and admitted that he had shined the laser. He also told me that he had "stashed" the laser in a shoe box on the top shelf of his grandfather's bedroom closet.

11. My conversation with defendant lasted about two minutes. Both defendant and I were standing while we talked, and our tone and volume were conversational. Defendant did not ask to leave or to go inside. Defendant was not ordered to sit down, nor did he sit down, during this brief conversation.

12. I do not recall asking defendant for permission to seize the laser. I knew that Sergeant Davenport was already inside the house conducting a search with defendant's aunt. Defendant had, seconds before, confessed to using the laser to strike aircraft and had described in detail precisely where we could find the laser. I did not expect that defendant would object to our retrieving the laser, and I was not trying to overcome any anticipated objection by defendant.

13. I went into the house and found Sergeant Davenport in a bedroom with defendant's aunt. I reported that defendant had confessed and told me where he had hidden the laser. Sergeant Davenport, defendant's aunt, and I proceeded to defendant's grandfather's bedroom closet. Sergeant Davenport pulled a white shoe box off the top shelf of the closet, and he extracted the laser from the box.

3

14.   Sergeant Davenport gave me the laser, and I went outside and gave it to another officer.   When I arrived outside, defendant was seated in a chair in the yard.   Officers from the Los Angeles Police Department ("LAPD") subsequently took control of the scene, and I departed.   I recall that I was on the scene for approximately 30 to 45 minutes in total before LAPD took control.

15.   In total, I was aware of seven officers on the scene during the approximately seven to ten minutes between our arrival and the time defendant confessed.   There were three officers from Burbank Airport Police Department, including Sergeant Davenport, and two officers from Burbank Police Department.   I was there with my partner from the Glendale Police Department.   As the ranking officer, Sergeant Davenport took the lead at the scene, and I assisted him.   The remainder of the officers who responded did not appear to be actively involved in the investigation, at least through the time that defendant confessed.   It is my understanding that the number of officers responding from different agencies was due to an overlap of jurisdictions.

16.   To my knowledge, none of the officers at the scene drew their weapons at any time.   I do not recall touching my service firearm during my brief conversation with defendant or at any other point at the scene, nor did I observe any other officers doing so.   I did not see Sergeant Davenport touch his service firearm at any point, including during his brief conversation with defendant.   Defendant was never handcuffed while I was talking with him.

17.   As a police helicopter pilot, I am acutely familiar

4

with the dangers associated with shining a laser at an aircraft in flight.

18.   I have seen laser pointers on numerous occasions.  To my knowledge, they can be as small as two inches in length and are frequently housed in a frail casing.  I am aware that a laser pointer can be easily destroyed or smuggled away from a crime scene.  I was once involved in an investigation where a suspect smashed a laser pointer and successfully concealed the pieces in a nail hole in the wall; the pieces were located only after defendant confessed and revealed their whereabouts.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge.

Executed August 17, 2012, in Los Angeles, California.

MICHAEL WOOLNER