UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES - GENERAL**

| Case No. | 2:12-cr-00345-SVW | Date | September 25, 2012 |
|---|---|---|---|

| Present: The Honorable | STEPHEN V. WILSON, U.S. DISTRICT JUDGE |
|---|---|
| Interpreter | |

| Paul M. Cruz | N/A | N/A |
|---|---|---|
| *Deputy Clerk* | *Court Reporter/Recorder, Tape No.* | *Assistant U.S. Attorney* |

| U.S.A. v. Defendant(s): | Present | Cust. | Bond | Attorneys for Defendants: | Present | App. | Ret. |
|---|---|---|---|---|---|---|---|
| Adam Gardenhire | Not | | x | Craig A. Harbaugh, DPFD<br>David Sutton, DPFD | Not | | x |

| Proceedings: | IN CHAMBERS ORDER re: MOTION to Suppress Unlawfully Obtained Statements and Evidence Filed by Defendants Adam Gardenhire [22] |
|---|---|

**I.   INTRODUCTION**

On August 6, 2012, Defendant Adam Gardenhire filed the instant Motion to suppress statements he made on the night of his arrest, which he alleges were elicited in violation of his right to remain silent under Miranda v. Arizona, 384 U.S. 436 (1966). The Motion further seeks to exclude the laser pointer found at Defendant's house on the ground that it was discovered during an unreasonable search. Finally, the Motion argues that Defendant's subsequent statements must be excluded as fruit of the allegedly unlawful search. Defendant's Motion is DENIED for the reasons set forth in this Order.

**II.   FACTUAL BACKGROUND[1]**

On the evening of March 29, 2012, a green laser pointer was shined into the skies above North Hollywood and struck a private jet attempting to land at Burbank Airport as well as a police helicopter. The helicopter traced the origin of the laser to Defendant Gardenhire's house and sent officers to the scene.

Five police officers arrived at Defendant's house sometime around 9:30p.m.[2] Three members of the Burbank Airport Police, Sergeant Thomas Davenport, Officer Timothy Schaefer and Officer Dannel Arnold, were dressed in full uniform with their sidearms holstered. Two Glendale police officers, Officer Woolner and his partner, were dressed in green flight jumpsuits. A police helicopter

---

[1] The Court held a hearing on September 4, 2012, to ascertain what happened at Defendant's residence that night. Unless otherwise specified, the facts set forth herein are undisputed.

[2] Defendant claims that six or seven officers initially came to the scene, but two testifying police officers, whom the Court finds credible, consistently identified five officers who were present initially. (Hearing Tr. at 11:4-6, 34:8-10).

| | : | |
|---|---|---|
| | Initials of Deputy Clerk | PMC |

cc:   USM
      PSA

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES - GENERAL**

was initially hovering above. Although it was shining its light into the yard at first, it ceased doing so after the officers arrived. (Hearing Tr. at 21:1-6). Because it was late in the evening, the front yard, encircled by a tall white fence, was dark except for a few houselights. Sergeant Davenport saw a woman, later identified as Defendant's aunt, running from the fence toward the house. He identified himself as law enforcement and asked to speak with her.

The aunt opened the gate to let the officers into the front yard. She told Davenport that it was her house, and that her nephew, Defendant, and her grandparents were inside. Davenport asked to speak to Defendant, so the aunt went inside to get him. Defendant came out of the house and walked over to Davenport.[3] When Davenport asked Defendant if he knew about someone pointing a laser at aircraft, Defendant said he did not, but suggested that his neighbors might. Defendant described this conversation as lasting no more than four minutes and being "real quick." (Hearing Tr. at 57:10). During this first conversation, Defendant never asked to reenter the house, to leave, or to stop talking. Davenport neither handcuffed Defendant nor ordered him to sit down; they were standing and talking face to face in a conversational tone. The other officers stood spread out on the yard. (Hearing Tr. at 41:8-10).

After Defendant denied involvement, Davenport walked ten feet to the aunt and asked her permission to search the house, which she gave cooperatively. (Hearing Tr. at 22:8-14; 45:12-15). Defendant did not object. Approximately five minutes after Davenport followed the aunt into the house, Officer Woolner began to speak with Defendant. At this time, the officers continued to be spread out on the yard: Officer Woolner stood about two feet from Defendant; Officer Arnold and Woolner's partner stood behind Woolner, about four to five feet away from Defendant; and Officer Shaefer stood farther back, near the gate. (Hearing Tr. at 15:15-16:7). Woolner told Defendant that the helicopter had traced the laser beam to his house, and that the police believed he was responsible. Woolner said, "Just be honest about it. Be a man and tell us the truth." Defendant then confessed that he shined the laser, and described that he hid the laser in a shoe box on the top shelf of his grandfather's bedroom closet. (Woolner Decl. ¶ 10). According to Defendant, this conversation lasted about a minute. (Hearing Tr. at 59:9-11). At some point during the conversation, Defendant was sitting down. (Hearing Tr. at 18:5-6). Woolner also testified that during his dialogue with Defendant, he pointed up at the helicopter overhead. (Hearing Tr. at 71:22-24). However, there is no evidence any officers ordered Defendant to sit or handcuffed him during this conversation. While there is no evidence that Defendant ever asked to leave or go inside, nor is there any hint that the officers told him he could not leave.

Once Defendant disclosed the location of the laser, Davenport asked the aunt for permission to search the grandfather's closet. The aunt consented, indicating that it was a community closet that everyone in the house used for storage. (Hearing Tr. at 48:24-49:13). Davenport and Woolner then found the laser where Defendant described.[4] After the officers left the house, the Los Angeles Police Department took control of the scene. Defendant concedes that it was at this stage that he was patted down and handcuffed. (Hearing Tr. 62:2-14). Approximately four to five hours later, FBI agents interviewed Defendant at a police station. They advised him of his <u>Miranda</u> rights before the interview. Defendant waived those rights orally and in writing, and he proceeded to confess again his use of the laser. (Gov't Opp., Ex. A). Defendant was charged with aiming a laser pointer at an aircraft in violation of 18 U.S.C. § 39A. He subsequently filed this suppression motion. (Dkt. 22).

---

[3] Defendant concedes that he exited the house because his aunt asked him to come outside. He also testified that once he was outside, he walked over to the officers because they "called [him] over." (Hearing Tr. at 56:9-15). In substantial conformity, Davenport, who first made contact with Defendant, testified that the aunt went inside to get Defendant, and that he came out and approached him. (Hearing Tr. at 41:1-5).

[4] Defendant's hearing testimony in this regard was self-contradictory. At first, Defendant testified that after he answered Davenport's questions, Davenport entered the house with the aunt. (Hearing Tr. at 58:8-16). Defendant later equivocated, however, stating that Davenport did not enter the house until after Defendant told him where the laser was. (Hearing Tr. at 59:13-60:7). This latter version is refuted by the common testimony of Davenport and Woolner, who testified that (1) Davenport entered the house with the aunt after his conversation with Defendant, (Hearing Tr. 45-12-21; 70:7-11), and that (2) Defendant divulged the laser's location to Woolner, not Davenport (Hearing Tr. 71:25-72:2). The Court therefore finds the officers' account more credible.

|  | : |
|---|---|
| Initials of Deputy Clerk | PMC |

cc: USM
    PSA

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES - GENERAL**

**III.   DISCUSSION**

Defendant seeks to exclude his statements to Davenport and Woolner, the laser pointer found in his house, and his subsequent confession at the police station. He argues that the statements on the yard are inadmissible because he made them during a custodial interrogation and before being Mirandized. (Mot. at 4-6). Defendant further argues that the laser pointer and his subsequent confession must be suppressed because they are fruits of an unreasonable search. (Mot. at 7-9). The Court first addresses the Miranda issue.

**A.   Interrogation Was Not Custodial**

It is black-letter law that "[s]tatements obtained in violation of Miranda may not be admitted against the accused, at least in the prosecution's case in chief." United States v. Patterson, 812 F.2d 1188, 1193 (9th Cir. 1987). However, "[a]n officer's obligation to give a suspect Miranda warnings before interrogation extends only to those instances where the individual is 'in custody.'" United States v. Kim, 292 F.3d 969, 973 (9th Cir. 2002). The parties agree that Defendant was interrogated without prior Miranda warnings. The only question is whether Defendant was "in custody" at the time of his interrogation on the yard.

The "in custody" inquiry is determined by an objective view of the totality of the circumstances. Id. In general, a court must decide "whether there [was] a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." Stansbury v. California, 511 U.S. 318, 322 (1994). In other words, the court asks whether "a reasonable person in those circumstances would have felt he or she was not at liberty to terminate the interrogation and leave." United States v. Craighead, 539 F.3d 1073, 1082 (9th Cir. 2008) (internal quotation marks omitted). The factors most likely to be relevant to deciding that question are:

(1) the language used to summon the individual;
(2) the extent to which the defendant is confronted with evidence of guilt;
(3) the physical surroundings of the interrogation;
(4) the duration of the detention; and
(5) the degree of pressure applied to detain the individual.

Kim, 292 F.3d at 974. In addition, where the interrogation takes place in the suspect's home, the Court weighs additional factors to evaluate whether the interrogation took place in a "police-dominated atmosphere":

(1) the number of law enforcement personnel and whether they were armed;
(2) whether the suspect was at any point restrained, either by physical force or by threats;
(3) whether the suspect was isolated from others; and
(4) whether the suspect was informed that he was free to leave or terminate the interview, and the context in which any such statements were made.

Craighead, 539 F.3d at 1084. The Ninth Circuit has not addressed whether the Craighead factors apply when the interrogation occurs in the front yard of the suspect's house, as opposed to inside the home. Indeed, it is unclear whether Craighead continues to govern home interrogations; subsequent Ninth Circuit cases concerning un-Mirandized home interrogations have not applied the Craighead factors. See United States v. Redlightning, 624 F.3d 1090, 1103-04 (9th Cir. 2010); United States v. Brobst, 558 F.3d 982, 995-96 (9th Cir. 2009). Nonetheless, the Court concludes that under both the Kim and Craighead tests, Defendant was not "in custody" when he answered Officers Davenport and Woolner's questions.

   **1.   *Kim* Factors**

First, the language used to summon Defendant was mild: Davenport asked the aunt to get Defendant, and Defendant voluntarily exited the house to speak to Davenport. This case is unlike United States v. Brobst, 558 F.3d 982, 995 (9th Cir. 2009), where the court concluded that the police command, "you need to come with me," was a show of force that supported a finding of

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES - GENERAL**

custody. The instant case is also distinguishable from Kim, where the suspect voluntarily entered her store, unaware that police officers would be inside waiting to question her. 292 F.3d at 974-77. The Ninth Circuit reasoned that under these circumstances, the fact that the police did not summon the suspect was "entirely uninformative" of whether she subsequently felt free to leave, since she had no intention of submitting to questioning in the first place. Id. at 974. Here, Defendant clearly knew that leaving the house would mean initiating contact with police. There is no suggestion to the contrary. Accordingly, this factor cuts against custody.

The fourth and fifth Kim factors also weigh decisively against a finding of custody. Defendant's conversations with Davenport and Woolner lasted four minutes and one minute, respectively. Defendant was neither handcuffed nor otherwise restrained during the questioning. He was not instructed to sit, though he did so on his own accord. Defendant never asked to leave or go inside, and the officers never told him he could not do so. Defendant was not patted down. While the number of armed policemen supports some degree of pressure, the Court finds credible the officers' testimony that they were spread out across the front yard, not huddled around Defendant. Therefore, the number of officers, standing alone, does not weigh heavily in favor of custody. See, e.g., Brobst, 558 F.3d at 997 (three armed officers did not, in and of itself, support a finding of custody, where two officers stood a conversational distance from the defendant, and a third officer stood some feet away during the interrogation). Indeed, this case is comparable to United States v. Gregory, 891 F.2d 732 (9th Cir. 1989), where the Ninth Circuit affirmed the district court's finding that the suspect was not in custody where he consented to be interviewed in his house, the interview lasted only a few minutes, and the officers made no suggestion that the suspect could not leave. Id. at 735.[5]

Although Officer Woolner presented Defendant with evidence of his guilt, the officer's accusations would not make a reasonable person feel as though he could not leave. This case is readily distinguishable from Brobst, where police were already inside the suspect's house when he arrived. They commanded him to follow them into his kitchen, where police presented him with a search warrant and told him that they had located child pornography in the house. The court reasoned that "[b]ecause (1) [the defendant] was immediately confronted with evidence of the child pornography against him and (2) the manner in which he was confronted, these facts weigh in favor of finding [the defendant] was in custody." Brobst, 558 F.3d at 995. Here, by contrast, Woolner entered through the front gate and had not yet located the laser when he confronted Defendant with the evidence against him. In this situation, a reasonable person would not feel as though the presence of inculpatory evidence had foreclosed the possibility of terminating the questioning.

The physical surroundings of the interrogation present a somewhat closer question. Defendant argues that the presence of the helicopter and five policemen created a police-dominated atmosphere. Although the helicopter was visible when Woolner was questioning Defendant, the aircraft had stopped shining its light on the house soon after the police arrived. And though there were five armed officers at the scene, the Court is mindful that while Davenport and Woolner were performing their duties, the other three officers were essentially standing guard. This was not a case, for instance, where several officers were crawling throughout the property. Cf. Craighead, 539 F.3d at 1083 ("A reasonable person interrogated inside his own home may have a different understanding of whether he is truly free 'to terminate the interrogation' if his home is crawling with law enforcement agents conducting a warrant-approved search."). Moreover, it is telling that, according to Defendant, Officer Woolner did not question him immediately after Davenport finished, but instead waited five minutes before restarting conversation. (Hearing Tr. at 57:25-58:1). This undermines the notion that Defendant was placed under great pressure by the officers. Nevertheless, given that Davenport was searching the house while the four officers waited on the yard, it is difficult to deny that a reasonable person would perceive some degree of police control over the situation. Thus, this factor weighs moderately in favor of custody.

Taken together, however, the majority of the Kim factors militate against a finding of custody. While the police did assert a certain degree of control over the premises, their presence inside the front gate, and later inside the house, was largely the product of the aunt's consent. This belies the Defendant's portrayal that police "invaded" his home. (Mot. at 3). Meanwhile, Defendant was

---

[5] Another factor against custody in Gregory was the fact that the suspect's wife was present throughout the interview. Gregory, 891 F.2d at 735. Although Defendant's aunt was not present at his side, this matters very little because, as discussed elsewhere, Defendant notes that his aunt was "extremely hostile" toward Defendant. (Mot. at 6).

| | : | |
|---|---|---|
| | Initials of Deputy Clerk | PMC |

cc: USM
    PSA

subjected to five minutes of conversation on his front porch, was not restrained, handcuffed, or patted down, and was not told he could not leave.  On balance, these factors do not support a finding that Defendant was in custody.

      2.     <u>Craighead</u> Factors

The <u>Craighead</u> factors do not counsel otherwise.  To begin, even though five armed officers arrived at the scene, their conduct distinguishes this case from <u>Craighead</u> in two important respects.  First, unlike the officers in <u>Craighead</u>, the officers here did not all pile into Defendant's home.  The Ninth Circuit explained that "when a large number of law enforcement personnel enter a suspect's home, they may fill the home such that there are no police-free rooms or spaces to which the suspect may retreat should he wish to terminate the interrogation."  539 F.3d at 1084.  This case is different because, in the period before Defendant's confession, all the officers except Davenport remained outside the house.  Thus, Defendant could reasonably have believed that he could retreat to some of the rooms in his house.  Second, whereas some of the officers in <u>Craighead</u> unholstered their service weapons, here Defendant conceded that <u>none</u> of the officers ever drew their guns. (Hearing Tr. at 62:2-3).  The <u>Craighead</u> court found this factor salient because unholstered weapons may reasonably lead the suspect to believe "that his home is no longer safe from the threat of police force."  539 F.3d at 1985.  Defendant, however, had no occasion to form this conclusion.  Finally, to reiterate, the placement and posture of the officers did not evince a plan to dominate the premises.  Therefore, if the sheer number of officers weighs in favor of custody, its effect is not substantial.

Second, as already explained, there is no question that Defendant was not restrained by physical force or verbal threats during the interrogation.  The officers never told Defendant that he could not leave, nor did the Defendant ever ask.  These facts are markedly different from those in <u>Craighead</u>, where the suspect was escorted to a back storage room, the door was closed behind him, and an officer stood with his back leaning against the door.  <u>Id.</u> at 1085.  Under these circumstances, the Court of Appeals held that a reasonable person could have believed he was "under guard."  <u>Id.</u>  Here, the officers did nothing of this sort.

Third, it is true that Defendant's relatives were not present on the yard during the questioning.  However, this isolation does not favor a finding of custody in this case.  Courts usually recognize such isolation as a hallmark of police domination because family and friends lend moral support to the suspect and deter him from making inculpatory statements.  <u>See</u> <u>Craighead</u>, 539 F.3d at 1087. Here, Defendant admits that his aunt was "extremely hostile" toward him, yelling at him and blaming him for the incident. (Mot. at 6:12-16).  Thus, there is no basis to assume that the aunt's presence during the questioning would have alleviated the pressure to confess.  This factor is therefore neutral.

Fourth, the record confirms that police did not inform Defendant that he was free to leave.  However, neither did they restrain him or say that he could not retreat inside.  In any event, "[t]he absence of explicitly informing the person that he or she is free to leave is not a dispositive factor" in the custody inquiry.  <u>United</u> <u>States</u> <u>v.</u> <u>Redlightning</u>, 624 F.3d 1090, 1103 (9th Cir. 2010) (citing <u>United</u> <u>States</u> <u>v.</u> <u>Orman</u>, 486 F.3d 1170, 1176 (9th Cir. 2007)).

On a final note, the Court has considered Defendant's suggestion that his young age should be a factor in determining whether or not he was in custody.  The Supreme Court recently has recognized that "a reasonable child subjected to police questioning will sometimes feel pressured to submit when a reasonable adult would feel free to go."  <u>J.D.B.</u> <u>v.</u> <u>N.</u> <u>Carolina</u>, 131 S. Ct. 2394, 2403 (2011) (questioning of thirteen-year-old seventh-grade student).  Thus, the Supreme Court held that "so long as the child's age was known to the officer at the time of police questioning, or would have been objectively apparent to a reasonable officer, its inclusion in the custody analysis is consistent with the objective nature of that test."  <u>Id.</u>  Here, Officer Davenport knew that Defendant was eighteen years old on the night in question. (Hearing Tr. at 43:11-12).  In observing Defendant testify during the hearing, the Court noted that Defendant answered the cross-examination questions with a degree of confidence and maturity commensurate with his age. The Court perceived no basis for concluding that Defendant is less mature than his peers.  Accordingly, the Court treats Defendant as what he is, an adult.

Although five officers came to Defendant's house, the Court cannot say that they created a police-dominated atmosphere. Based on the totality of the circumstances, a reasonable person in Defendant's position would not have felt as though he could not stop

                                                                                                                                                               :         

                                                Initials of Deputy Clerk      PMC

cc:  USM
       PSA

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES - GENERAL**

the questioning and leave, for instance, by retreating to his room. Therefore, Defendant's statements to Davenport and Woolner were not made during a custodial interrogation. Consequently, the fact that he was not Mirandized prior to the statements does not undermine their admissibility.

  **B.  Search of the House Was Lawful**

  Defendant next argues that the laser pointer and his subsequent confession to the FBI must be suppressed because they are fruits of an unlawful search. The parties agree the search was conducted without a warrant. "A warrantless search is unconstitutional unless the government demonstrates that it fall[s] within certain established and well-defined exceptions to the warrant clause." United States v. Brown, 563 F.3d 410, 414 (9th Cir. 2009) (internal quotation marks omitted). "Consent constitutes one such exception: [A warrantless] search conducted pursuant to a valid consent is constitutionally permissible." Id. at 415 (internal quotation marks omitted). To be valid, however, a consent to search must be voluntary. Schneckloth v. Bustamonte, 412 U.S. 218, 228 (1973). "The government bears the burden of proving that consent was voluntary." Brown, 563 F.3d at 415. Whether consent is voluntary depends on the totality of the circumstances, guided by these five factors:

  (1) whether the consenting individual was in custody;
  (2) whether the officers had their guns drawn;
  (3) whether Miranda warnings were given, if applicable;[6]
  (4) whether the consenting individual was notified of her right not to consent; and
  (5) whether the consenting individual was advised that a search warrant could be obtained.

Id. A person's knowledge of a right to refuse, however, is not a prerequisite to voluntary consent. Schneckloth, 412 U.S. at 232-33.

  As an initial matter, there is no serious debate that the aunt had authority to consent to the search of the house because she was a co-occupant of the house. Davenport testified that she told him that she lived at the house. (Davenport Decl. ¶ 4). Similarly, it is undisputed that the aunt had authority to consent to the search of the grandfather's closet because, as she related to Davenport, it was a communal closet that all the tenants used. (Hearing Tr. at 48:24-49:13). Having established the aunt's authority to consent, the Court turns to whether her consent was voluntary.

  First, it is undisputed that the aunt was not in custody. Second, Defendant concedes that none of the officers had their guns drawn. Third, because the aunt was not in custody, she was not entitled to a Miranda warning. Fourth, though the aunt was not informed of her right to refuse consent, this fact is not dispositive. Fifth, she was not told that a search warrant could be obtained. The officers gave undisputed testimony that the aunt was cooperative and gave her consent willingly. (Hearing Tr. 22:8-14; 45:12-15). Viewing the totality of these facts, the Court concludes that the aunt's consent to search the house, and later the grandfather's closet, was voluntary.

  Defendant argues that his aunt's consent was involuntary because she believed[7] she had no choice but to give it. Specifically, Defendant contends that the aunt believed she had no choice because police told her to "put her hands up" and some police entered the house without first obtaining permission. (Mot. at 7). This argument is baseless. Davenport told the aunt to keep her hands where he could see them when he first approached the front gate, but he did not tell her to put them up. Defendant has not countered this fact. Moreover, consistent with Defendant's testimony, the officers' testimony uniformly establishes that no police entered the house before Davenport asked the aunt for permission to enter. (Hearing Tr. 13:21-14:9; 29:22-30:4). Thus, the Court finds that a reasonable

---

  [6] Miranda warnings are not applicable if the consenting individual is not "in custody." United States v. Basher, 629 F.3d 1161, 1168 (9th Cir. 2011).

  [7] Defendant withdrew the aunt's declaration prior to the Court's September 4th hearing, and the aunt did not testify at the hearing.

|  | : |
|---|---|
| Initials of Deputy Clerk | PMC |

cc: USM
  PSA

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES - GENERAL**

person in the aunt's position would not have felt compelled to consent.

Defendant next argues that even if his aunt's consent was voluntary, it was not valid because police removed Defendant from the entrance for the sake of avoiding his potential objection. In Georgia v. Randolph, 547 U.S. 103, 106 (2006), the Supreme Court ruled that an occupant who shares, or is reasonably believed to share, authority over an area in common with a co-occupant, may give valid consent to search the area. If the co-occupant objects, however, the search may not proceed. Id. In accordance with this rule, the Supreme Court clarified that the occupant's consent is only valid "so long as there is no evidence that the police have removed the potentially objecting tenant from the entrance for the sake of avoiding a potential objection." Id. at 121-22.

The record contains no hint of such impropriety. First, there is no evidence that police moved Defendant away from the entrance to avoid his potential objection. To the contrary, even though Defendant was standing less than ten feet from the entrance, and could see it from where he stood, he did not object when Davenport asked the aunt for permission to enter. (Hearing Tr. at 45:16-46:5; 46:7-9; Davenport Decl. ¶ 6). Subsequently, when Defendant disclosed to Woolner the specific location of the green laser pointer, he did not say that the officers could not search for it. Thus, there is no evidence to suggest that the officers purposely manipulated Defendant to preclude him from objecting to their search. If anything, Defendant implicitly consented to the search of the closet by describing the laser's location in such detail. Accordingly, the Court concludes that the search of the house and the grandfather's closet was based on the aunt's valid consent. Therefore, the laser pointer and the subsequent statements at the police station are admissible as fruits of the lawful search.

   **C.**  **Laser Pointer and Statement to FBI Are Admissible Regardless of Miranda Violation**

Even if the interrogation in the yard violated Defendant's Miranda rights, the laser pointer uncovered by the lawful search, followed by Defendant's confession to the FBI, would nevertheless be admissible at trial. As elaborated on below, the Ninth Circuit has recognized that testimonial and non-testimonial evidence discovered as a result of statements obtained in violation of Miranda may still be admissible at trial. United States v. Gonzalez-Sandoval, 894 F.2d 1043, 1048 (9th Cir. 1990).

     1.  Legal Standard for Admissibility of Evidence Derived from *Miranda* Violation

The Supreme Court has held that "the *Miranda* presumption of compulsion, although irrebuttable for purposes of the prosecution's case in chief, d[oes] not require that the unwarned statements and their fruits be discarded as inherently tainted." Id. (quoting Oregon v. Elstad, 470 U.S. 298 (1985)); see also Michigan v. Tucker, 417 U.S. 433, 455-51 (1974) (holding that Fourth Amendment exclusionary rule did not extend to evidence derived from voluntary statements obtained in violation of Miranda). In Elstad, the Supreme Court ruled that a suspect's confession, though preceded by an un-Mirandized admission of guilt, may still be admissible at trial. 470 U.S. at 318. In determining the admissibility of a suspect's subsequent statement, "the court should look first to determine whether the statement made by a defendant before the Miranda warning was actually coerced in violation of the fifth amendment." United States v. Wauneka, 770 F.2d 1434, 1440 (9th Cir. 1985). If the prior statement was not coerced, "the court should suppress the statement given after the *Miranda* warning only if the court finds that the subsequent statement was not voluntarily made." Id.

The Ninth Circuit has applied the same principle to non-testimonial physical evidence obtained as a result of a Miranda violation. See Patterson, 812 F.2d at 1193 (statements taken in violation of Miranda may be used in an affidavit to establish probable cause for a search warrant); United States v. Lemon, 550 F.2d 467, 473 (9th Cir. 1977) (statements obtained in violation of Miranda may be used during motion to suppress to show probable cause). In each case, "the critical inquiry is whether the unwarned statements preceding a subsequent, warned confession or discovery of derivative evidence are made voluntarily. Where there is no evidence of coercion or a denial of due process in elicitation of the statements, the object of the fifth amendment exclusionary rule—assuring trustworthiness of evidence introduced at trial—is not served by barring admission of the derivatively obtained evidence or statements." Gonzalez-Sandoval, 894 F.2d at 1048.

In Gonzalez-Sandoval, a dispute arose over admissibility of testimonial and non-testimonial evidence obtained as a result of

|  | : |
|---|---|
| Initials of Deputy Clerk | PMC |

cc: USM
  PSA

the defendant's prior unwarned statement.  There, border patrol agents failed to Mirandize the defendant before asking him where he was born, whether he had papers verifying his immigration status, and whether he previously had used an alias.  Id. at 1046.  Using the defendant's answers, the agents discovered a record of his previous deportation.  Id.  Faced with this evidence, the defendant gave a Mirandized confession of his prior removal and use of the alias.  Id. at 1049.  The Ninth Circuit had no trouble concluding that the defendant's initial statements were obtained in violation of Miranda.  Id. at 1047.  Nonetheless, the court held that because the defendant's preceding un-Mirandized statement was made voluntarily, the deportation record was admissible at trial.  Id.  With respect to the confession, the court concluded, applying Elstad, that because both the initial un-Mirandized statement and the subsequent Mirandized confession were voluntary, the latter was admissible at trial.  Id. at 1049.  Accordingly, the court sustained the conviction.  Id. at 1053.

   2. Analysis

  Even if Defendant's statements on the yard were obtained in violation of Miranda, the laser pointer is inadmissible only if the prior unwarned admissions were involuntary.  "'Coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the due process clause.'"  Gonzalez-Sandoval, 894 F.2d at 1048 (quoting Colorado v. Connelly, 479 U.S. 157, 167 (1986)).  For the same reasons discussed above, there is not a scintilla of evidence that Defendant's statements to Davenport and Woolner were coerced.  The officers neither restrained nor threatened Defendant in any manner.  Accordingly, the unwarned admissions do not render the laser pointer inadmissible.

  The Court further concludes that Defendant's subsequent confession to the FBI is admissible irrespective of his unwarned statements five hours earlier.  In Elstad, the defendant admitted to being at the scene of the crime prior to receiving any Miranda warnings.  He was taken to sheriff's headquarters, where, approximately one hour later, the officers read the defendant his rights.  He indicated that he understood his rights and waived them, signing a written confession.  470 U.S. at 301-02.  The Supreme Court concluded that because the defendant's earlier unwarned remarks were voluntary, and because he gave his subsequent confession after proper Miranda warnings and a knowing and valid waiver, the latter was admissible at trial.  Id. at 314-15, 318.  Similarly here, Defendant's statements in the yard and his confession to the FBI were both voluntary.  The FBI report indicates that prior to the interview, agents provided Defendant with an advice of rights form, which was read aloud as Defendant read along.  (Gov't Opp., Ex. A at 1).  Defendant told the agents that he understood the form, and waived his rights orally and in writing.  (Gov't Opp., Ex. A at 1, 4).  Defendant has not contested the veracity of this Report, and has not otherwise suggested that his statements to the FBI were coerced.  Based on the foregoing, the Court concludes that Defendant's subsequent confession to the FBI is admissible even if his earlier admissions at the house are not.

**IV.** **CONCLUSION**

  Defendant's unwarned statements are admissible because Defendant was not in custody when he made them.  However, even if those voluntary statements were obtained in violation of Miranda, this would not affect the admissibility of the laser pointer and the statement Defendant gave to the FBI.  The laser pointer and the FBI statement are admissible as fruits of a lawful search.  Accordingly, Defendant's Motion to Suppress is DENIED.

|  | : |
|---|---|
| Initials of Deputy Clerk | PMC |

cc: USM
  PSA